## D. STEWART RIDGELY, ET AL. *v.* MARTHA GROVERMAN PFINGSTAG

[No. 23, October Term, 1946.]

*Decided December 11, 1946.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, and MARKELL, JJ.

*Arthur W. Machen* and *H. Vernon Eney*, with whom were *J. Britain Winter* and *Charles C. Atwater* on the brief, for the appellants.

*James C. Burch* and *L. Wethered Barroll* for the appellee.

MARKELL, J., delivered the opinion of the Court.

Opposing contentions in this case relate to interpretation of (1) a decision of this court sixty-five years ago (*Heald v. Heald,* 56 Md. 300) construing the will of

William Heald, who died in 1868, and (2) acts, omissions, statements and legal proceedings, on the part of heirs, or successors in interest to heirs, of the testator during these sixty-five years. These contentions have been ably presented in oral argument and in full, but compact, well-indexed briefs and appendices and have been carefully considered. Our conclusions permit us to omit mention of many of the facts, and some of the contentions, presented.

The testator died in November, 1868. His will was dated March 11, 1865, a codicil (not now material) June 10, 1867. He left three adult sons, William H., John H. and Howard, two infant children, Charles M. and Alice H. (later Groverman), and three infant children, William, Charles and John Creswell, of a deceased son, Edward, and four infant children, Mary, Josephine, William and Eleanor, of a deceased daughter, Adeline (Heald) Spurrier. He divided his estate into seven parts, three of which he gave absolutely to his adult sons, whom he also appointed his executors. Two parts he gave to his son John H. in trust, for Charles M. and Alice H., respectively, for life, then for their surviving children for their lives, with remainder (held void for remoteness) on the death of any of the children to the child's surviving issue absolutely, and with other contingent provisions. The other two parts he gave to his son John H. in trust, for Edward's children (Item 6) and the Spurrier children (Item 10), respectively, for their lives, with survivorship among them on the death of any without issue, then for their surviving children for their lives, with remainder (held void for remoteness) on the death of the children of any one of the grandchildren (of the testator) to the testator's right heirs absolutely, with other contingent provisions. The provisions of Items 6 and 10 are generally similar but in some respects substantially different.

By Item 10 the testator directs that one of the seven shares (after a specified deduction) be invested by his executors "in permanent ground rents" in Baltimore,

in the name of his son John H. Heald, "to be held by him and his heirs in trust * * * for the use and benefit of Mary, Josephine, William and Eleanor Spurrier, * * * Share and Share alike, during the term of their respective natural lives, * * * to permit them * * * to receive and to collect the said rents as they may fall due, during said term of their respective natural lives, with no power to either or all of them to dispose of the said equitable life estate, or any part thereof, in any way or to incumber the same it being my will and intention that they * * * shall have no control over any part of the property out of which said rents and profits issue, except the yearly rents and profits thereof, after the same shall have been due, and on the death of either of the said children of my said daughter Adeline, without issue living at the time of his or her death, then, in further trust for the survivors or survivor of them, (the said Mary, Josephine, William and Eleanor) in the same way as and with no greater control over the said deceased child's share of said rents than the same was held and enjoyed by said child. And on the death of either of the said children of my said daughter Adeline, leaving issue as aforesaid, then in further trust for the use of the children of the body of such deceased child living at the time of his or her death share and share alike during the term of their respective natural lives and from and after the death of the said children of such deceased child then to my right heirs Share and Share alike forever absolutely and freed from said trust." In certain contingencies "the Share of the proceeds of the sale" of any property accruing to the Spurriers (under Items 2, 3, 4, 5, 6, 7 or 8) are to be "reinvested in permanent ground rents" in Baltimore, in trust "in the same way" during their respectives lives and after the death of either of them. Items 2, 3, 4, 5, 6, 7 and 8 contain corresponding provisions for sale and reinvestment of such accruing shares of the Spurriers. Item 11 confers on the executors full power to sell real estate "for the

purpose of executing, fulfilling and carrying out the trusts or any of the provisions" in the will.

On January 10, 1880 John H. Heald, trustee, filed a bill against the other parties in interest for the construction of the will. This case culminated in the decision of this court in *Heald v. Heald, supra.* Construing Item 10, this court said:

"In regard to the devise to the Spurrier children we are of opinion:

"1st. That they take an equitable life estate with survivorship on the death of any of them without issue.

"2nd. That their children take equitable estates for life, in the shares of their parents.

"3rd. That the devise over to the testator's heirs after the death of the children of each of the named grandchildren is void, and the equitable fee descended on the death of the testator, to those who were then his right heirs, subject to the successive equitable estates for life.

"Survivorship by implication would seem to exist among the children of each of the Spurrier children, because the attempted devise over to the testator's heirs is made to take effect from and after the death of 'said children of said deceased child'." 56 Md. 312, 313.

In 1869 Mary Spurrier died intestate, unmarried, without issue. In 1879 William Spurrier died intestate, leaving three sons, Howard G., Walter and Ernest L. On February 6, 1912 Josephine Spurrier died intestate, unmarried, without issue. On December 8, 1930 Mrs. Eleanor Spurrier Brunt died testate, a widow, without issue. Walter Spurrier died intestate in February, 1916, Ernest L. Spurrier on July 27, 1929 and Howard G. Spurrier in May, 1943.

On April 20, 1900 Ernest L. Spurrier and wife sold and conveyed to Auxiliary Realty Company, a corporation controlled by David Stewart, all Ernest's interest, "legal or equitable, vested or contingent, in possession or expectancy," under the will of the testator, or as heir of the testator or of William Spurrier. On February

13, 1902 Howard G. Spurrier's interest, and on September 27, 1902 Walter Spurrier's interest, were similarly sold and conveyed to Stewart's wife. By mesne conveyances the interests of the three Spurriers passed on November 29, 1916 to Stewart, trustee for his daughter, and on June 12, 1928 to Stewart individually.

John H. Heald died on February 2, 1896. His eldest son, and heir at common law, John M. D. Heald, died in February, 1916. Edward Ernest Heald was the only son, and heir at common law, of John M. D. Heald.

On January 30, 1900, ten days after acquiring Ernest's interest, Stewart's corporation filed a bill for assumption of jurisdiction of the trust created by Item 10, appointment of a trustee in place of John H. Heald deceased, and to surcharge the accounts of the administratrix of Howard Heald and John M. D. Heald, executor of John H. Heald, as to property held in trust under Item 10. In this bill it was alleged that by the decision of this court Eleanor (Spurrier) Brunt, Josephine Spurrier, Walter, Howard G. and Ernest L. Spurrier had equitable estates in the property covered by Item 10, "with cross remainders until they are all dead." The answer of Josephine L. Spurrier and Eleanor Brunt and husband admitted that under the decree of this court the descendants of Adeline Spurrier "take equitable estates with cross remainders over as therein determined." This suit never went to decree.

On March 27, 1905 Mrs. Stewart and husband and Stewart's corporation filed a bill against Josephine Spurrier, Eleanor Brunt and husband, and all other persons (except their three Spurrier assignors) who were heirs of the testator at the time of his death, or heirs or assigns of such heirs, for the sale of an irredeemable ground rent of $990 (then in default) on Postoffice Avenue property and investment of the proceeds so as to enure "to the use of the same parties now entitled to the ground rent." In the bill it was alleged that this court had decided that the trust would continue "during the lifetime of the longest liver of the children and grand-

children of Adeline Spurrier, who would have equitable life estates therein with cross remainders." The answer of Josephine Spurrier and Eleanor Brunt admitted that the will had been construed by this court and the construction "as thereby determined" is binding, but left plaintiffs "to the proof of their claim of title" and "of their pretensions in regard thereto." The answer of John M. D. Heald, individually and as trustee, admitted the death of John H. Heald, trustee, and the construction of the will by this court, and that "by operation of law the legal title to the trust property * * * descended to and is vested in him under the statute," but left plaintiffs "to the production of the will * * * for the ascertainment of the character of the trust" as determined by this court. The answer of Alice H. (Heald) Groverman and husband admitted "the allegations of the bill" and consented to "the passage of such decree as may be proper herein." On December 26, 1907 a decree for sale was passed, appointing William H. Dawson and David Stewart trustees to sell. The trustees reported a sale, which on May 1, 1908 was finally ratified, for $5250, including $1250 cash and a $4000 mortgage. On April 23, 1913, on the petition of "John M. D. Heald, trustee in the above entitled cause," he was granted leave to "invest of the trust funds in his hands" $3913.02 in the purchase of three redeemable ground rents of $75 each on Westwood Avenue properties. On July 25, 1913 he reported payment to him, "trustee in this cause," of the mortgage for $4000, with interest, investment of $3913.02 thereof in the Westwood Avenue ground rents, payment of the interest to the tenants for life, leaving $86.98 in his hands.

On June 1, 1916, on petition of Eleanor Brunt in the 1905 case and suggestion of the death of John M. D. Heald, trustee, Thomas J. Lindsay was, by order, appointed "trustee to administer the trusts in this cause created by the will" of the testator, was required to give bond for $2000 for performance of his trust, "as substituted trustee under the will * * * for the children of

Adeline Spurrier," and was authorized to receive from the administratrix of John M. D. Heald, "all title deeds, evidences of debt, bank books, etc." On March 2, 1928, on petition of Eleanor Brunt, averring that she was "a life-tenant of one-half interest in the trust estate" and as such was "entitled to one-half of the income," and reciting the death of Thomas J. Lindsay on October 21, 1927, George Carey Lindsay was, by order, appointed "substituted trustee to administer the aforesaid trust ["for the benefit of the children and descendants of Adeline Spurrier"] created by the will" of the testator, "with all the powers and duties" of Thomas J. Lindsay. On May 17, 1944, a petition of George Carey Lindsay, "substituted trustee," recited that there had been on deposit prior to his appointment the sum of $419.75, that there was then on deposit (after failure of the Baltimore Trust Company) $263.74, that "in addition thereto" he had three Westwood Avenue ground rents of $75 each, and that he desired "to resign and retire from said trusteeship," and prayed an order permitting him to do so. A show-cause order was passed the same day. On October 19, 1944, by order, Mr. Lindsay was released and discharged from the further execution of the trust and James C. Burch was appointed substituted trustee in his place.

On February 11, 1913 Mrs. Stewart and husband and Stewart's corporation filed another bill against all parties in interest, under Item 10 of the will or as heirs or successors in interest to heirs, for the sale of four irredeemable ground rents of $60 each on Conway Street properties and investment of the proceeds. In the bill plaintiffs asserted equitable title to a "one-half undivided interest during the lives of Howard G., Walter and Ernest L. Spurrier, and the survivor of them, with the right to the whole equitable title after the death of Eleanor E. Brunt and until the last of said Howard G., Walter and Ernest L. Spurrier shall die." None of the defendants in their answers either admitted or denied this assertion of title, but a number assented to the proposed

sale and reinvestment. On June 27, 1913 a decree for sale was passed, appointing Thomas J. Lindsay trustee to sell, and directing him to bring the purchase money into court "to be re-invested under its orders and directions in the purchase of ground rents, or other securities approved by the Court, such re-investments to be made in the name of John M. D. Heald, trustee in succession under the will," to abide the terms of the will as to "Adeline Spurrier, her children, their descendants and the persons entitled in remainder." An auditor's account finally ratified August 9, 1913 charged Mr. Lindsay, trustee, with $92 "accrued ground rent on Conway Street rents sold and awarded this accrued rent one-half to Stewart's wife and his corporation and one-half to Mrs. Brunt. Another auditor's account, finally ratified October 24, 1913, awarded a balance of $121.86 to John M. D. Heald, substituted trustee, to be held under the terms of the will, and also awarded $23.37 income (interest on bank deposit) in the same proportions. Pursuant to a report and an order passed September 24, 1913, Thomas J. Lindsay, trustee, had purchased seven redeemable ground rents, one for $45, the others for $42 each, on Lakewood Avenue properties, in the name of John M. D. Heald, substituted trustee under the will.

On June 6, 1933 the owners of the leasehold interest subject to one of the $42 Lakewood Avenue ground rents filed a petition in the 1913 case reciting that "John M. D. Heald is now dead and no person has been substituted trustee in his place * * * to hold title to the said rent," and even if such a substituted trustee had been appointed he would have "no power of sale over this ground rent" so that he could convey title to petitioner, and that petitioners desired to redeem the ground rent, and praying that a trustee be appointed to convey the reversion and ground rent of $42, and upon receipt of payment of the redemption money with all accrued ground rent, to execute and deliver a deed to petitioners. On the same day, by order (erroneously dated February 6, 1933), David Stewart was appointed "substituted trustee in the place

* * * of John M. D. Heald, substituted trustee" under the will, "as hereinbefore set forth," and was directed to collect from petitioners the redemption money in payment of the $42 ground rent and upon receipt thereof with accrued ground rent to convey to petitioners the reversion and ground rent by deed, and to render to the court "a complete report of his proceedings hereunder immediately after consummating the conveyance * * * of the reversion and * * * ground rent aforesaid." On June 8, 1939 "David Stewart, substituted trustee under the will," on his own petition, was by order "authorized and empowered to execute and deliver" to the owners of the leasehold, a deed for another of the $42 Lakewood Avenue ground rents upon payment of $700 and accrued ground rent. On July 26, 1939, September 13, 1941 and February 16, 1942 respectively, on similar petitions and by similar orders, he was authorized to execute and deliver to the leaseholders deeds for two more $42, and the one $45, Lakewood Avenue ground rents, upon payment of $700 and $750 respectively. Pursuant to these five orders he conveyed these five Lakewood Avenue ground rents to the leaseholders and received the redemption prices, aggregating $3550. He never reported to the court any of these redemptions of ground rents. He deposited these trust monies in his personal bank account, in which he always had a balance far in excess of the trust monies. When he heard of the death of Howard G. Spurrier he transferred the $3550 into a separate bank account in his name as trustee.

On January 30, 1940 "David Stewart, substituted trustee under the will," on his petition and by an order similar to those with respect to the four Lakewood Avenue ground rents, was authorized to execute and deliver to the City a deed for a $40 irredeemable ground rent on Fayette Street property (which the City proposed to condemn for street widening) upon payment of $800. This Fayette Street ground rent had not been mentioned in the bill, or acquired in the proceedings, in the 1913

case. It was never actually sold or redeemed under this order in the 1913 case.

On November 17, 1943 a daughter of Walter Spurrier, Mrs. Eney, filed a petition in the 1913 case, alleging that Howard G. Spurrier had died in May, 1943, intestate and unmarried, that there had been no accounting by Stewart, substituted trustee, for any of the proceeds of redemption of the Lakewood Avenue ground rents or for "any of the sums or funds collected" under Item 10, that this court had indicated that survivorship existed among the children of Adeline Spurrier's children, that upon the death of Howard G. Spurrier the last of the successive life estates ceased and "the equitable fee" became distributable to the successors in interest to the heirs of the testator at the time of his death, and that the conveyance of Walter's interest to Stewart's wife was only a mortgage, and praying that Stewart, substituted trustee, be removed and some person appointed in his place as substituted trustee, and that he account "for all funds collected by him as substituted trustee under the will * * * or collected by him in any other capacity" from any part of the property intended to be held under Item 10 for the benefit of Adeline Spurrier's children or her children's children. On December 1, 1943 Stewart's answer to this petition was filed, in which he denied that the conveyance of Walter's interest was only a mortgage or that petitioner had any interest in the trust property, and alleged that he was guilty of no improper conduct in not investing the redemption money as it came in, that the sums of $700 were difficult to invest, especially in ground rents, that he never used any of the trust money, and that those interested had benefited by his not investing the funds, which (if invested) would have been depleted by costs through a sale of the investments under a partition proceeding.

On the same day, December 1, 1943, Stewart died at the age of 87. On December 2, 1943, on petition of the same petitioner in the 1913 case, reciting Stewart's death, James C. Burch was, by order, appointed "substituted

trustee in the place * * * of David Stewart, substituted trustee, deceased" and required to give bond for $3550. On December 24, 1943 Stewart's executors (the appellants) reported the receipt by Stewart of $3550 from redemption of five Lakewood Avenue ground rents, and also receipt of $42 ground rents collected by him since the death of Howard G. Spurrier but before he knew of Howard's death, and stated that this $3592 had been turned over to James C. Burch, substituted trustee.

On June 27, 1944 appellants filed a petition to rescind the order of December 2, 1943 appointing Mr. Burch substituted trustee. Mr. Burch answered at length, appellants demurred to his answer, and on August 17, 1944, Judge Henderson signed an order sustaining the demurrer, rescinding the previous order, and reciting that "this proceeding" (the 1913 case) related solely to the sale of the Conway Street rents and to the reinvestment of the proceeds thereof, and not to any other portion of the property held under Item 10, that "any and all trusts" under Item 10 "had ceased and determined" prior to December 2, 1943, and that "the legal title absolutely or in fee simple had vested in possession as well as in interest in the heirs and assigns of William Heald living at the time of his death or their representatives."

On December 1, 1939 Charles M. Heald, last surviving child of the testator, died without issue. In that contingency, under Items 4 and 7, his share was to go to the then living issue of the testator's then deceased childred, *per stirpes* and not *per capita,* the Spurriers' share to be sold and the proceeds reinvested and held in trust under Item 10. *Heald v. Heald, supra,* 56 Md. 305, 310. On October 10, 1941 the substituted trustee under Items 4 and 7, a leaseholder who desired to redeem a ground rent, and seven other persons (including descendants of the testator) filed a bill against more than a hundred defendants for final distribution of the estate and property under Items 4 and 7, sale of a ground rent for redemption, and sale of all other ground rents for distribution. In his answer, filed February 9, 1943, David

Stewart denied that he was trustee under Item 10. The proceedings in this 1941 case were prolonged and voluminous. We do not think any of these proceedings or the assertions or denials, correct or mistaken, in them, are material in the case at bar.

After the death of Mary Spurrier in 1869, the income, *i. e.*, the rents, under Item 10 were received in equal one-third shares by her sisters, Josephine and Eleanor, and her brother, William. After the death of William in 1879, his third was received by his three sons until their interests were sold to Stewart's corporation and Mrs. Stewart, and afterwards was received by the Stewarts. After the death of Josephine in 1912, the income was received one-half by Mrs. Brunt and one-half by the Stewarts. After Mrs. Brunt's death in 1930, all the income was received by Stewart until Howard's death in 1943. During the life of any of the four Spurrier children or the three grandchildren—and during Stewart's life (unless by implication by Mrs. Eney's petition of November 17, 1943)—apparently nobody ever disputed Stewart's position that Item 10 created cross-remainders between the children and the grandchildren. If this position was not correct, then Stewart was never entitled to receive more than one-third of the income under Item 10.

After William's death his widow married Clarence H. Forrest and died in 1929. Until his sons sold their interests to the Stewarts their income was collected for them by their mother or step-father, Mr. or Mrs. Forrest, afterwards by Stewart for himself. From 1892 Josephine's income until her death in 1912 and Mrs. Brunt's income until her death in 1930 were collected for them by the real estate firm of George W. Lindsay and Sons. Before 1892 John H. Heald had received their income for them, not under claim of right or duty as trustee. On September 7, 1892 he gave the Lindsays a letter stating that, as Mrs. Brunt and Josephine had appointed the Lindsays their agents, the Lindsays were "entitled to receive all ground rents due them" which he

had theretofore received, and bearing a notation that Mrs. Brunt and Josephine had "the right to collect the ground rents under the will," as would "appear on examination of said will," and that each was entitled to one-third of each rent.

Stewart continued to collect all his rents, except the Westwood Avenue rents acquired in 1913 by re-investment in the 1905 case. After the acquisition of the Westwood Avenue rents, or at least after the death of John M. D. Heald and the appointment in 1916 of Thomas J. Lindsay as trustee in the 1905 case, the Lindsay firm, as agents, collected the Westwood Avenue rents not only for Mrs. Brunt but also for Stewart, deducting collection charges and the premium on the trustee's bond, and remitting half of the balance to each. Until 1927, Stewart's half was remitted in the name of his corporation. On November 17, 1927, Stewart wrote the firm that for many years his Westwood Avenue rents had stood in the name of "David Stewart, Trustee," (*i. e.*, trustee for his daughter), and his corporation had no interest in them, and asking them to make the account on their books "Mrs. E. E. Brunt & David Stewart, Trustee." The firm complied with this request, and as Stewart never notified them of the subsequent conveyances from Stewart, trustee, to Stewart individually, checks and accounts thereafter were sent to Stewart, "trustee."

After Mrs. Brunt's death on December 8, 1930, Stewart on March 31, 1931 wrote the Lindsays that under the will the entire income was then payable to him during Howard's life, that in the future he would send out the bills for the entire rent [other than the Westwood Avenue rents] and asking them to send him the income which had accumulated since Mrs. Brunt's death. On April 1, 1931 the Lindsays complied with this request, and thereafter collected no rents for Stewart except the Westwood Avenue rents.

On December 27, 1943 a bill was filed by James C. Burch, substituted trustee under Item 10, and Walter Spurrier's daughter, Mrs. Eney, and her husband, against

some 150 defendants for sale, in lieu of partition, of ground rents. On May 9, 1944 Mrs. Pfingstag, (appellee), granddaughter of Alice H. (Heald) Groverman, was made a party plaintiff. On demurrer by Stewart's executors, Mr. Burch, trustee, and several classes of unnecessary defendants were eliminated as parties, and Stewart's executors were made defendants as trustees, as well as executors. The amended bill filed September 20, 1944 names some 75 defendants. This case will be referred to as the Partition Case.

On May 4, 1944 the widow and some of the descendants of Ernest Spurrier filed a bill against the appellants to have the Spurrier conveyances to the Stewarts declared mortgages and not absolute deeds. This case will be referred to as the Mortgage Case.

On March 27, 1944 Mr. Burch, as trustee under Item 10, and Mrs. Pfingstag (appellee) filed a bill against the appellants for an accounting. This case will be referred to as the Accounting Case. On demurrer to the bill (which was sustained) it was ordered that Mr. Burch, as trustee, be stricken out as a plaintiff with leave to Mrs. Pfingstag, plaintiff, "to file an amended bill." On December 18, 1944, Mrs. Pfingstag filed an amended bill "in her own right and in behalf of all the heirs" of the testator "who might be entitled to share in the funds hereinafter mentioned." She alleged that from December 8, 1930 to February 6, 1933 David Stewart, individually, collected the entire rents under the trusts under Item 10, "and neglected to account for the same," that since February 6, 1933 "David Stewart, substituted trustee," collected the rents and failed and neglected to account "for the said rents collected by him which your complainant claims is rightfully due her"; that upon the death of Mrs. Brunt on December 8, 1930, "the income of two-thirds of the entire trust" under Item 10 "passed to the trustee for the use and benefit of the descendants" of the testator or his "heirs at law." The bill prayed that Stewart's executors account "for all rents, profits, issues, incomes and interest collected by the said

David Stewart, individually and as Substituted Trustee, from the trusts" under Item 10, from December 8, 1930 to December 1, 1943. The appellants in their answer set up the defenses of limitations and laches and "lack of proper parties plaintiff," and on the merits adhered to Stewart's position that Item 10 created cross-remainders between the children and the grandchildren of Adeline Spurrier.

On April 27, 1945, on petition of the appellants opposed by Mrs. Pfingstag, the Partition Case, the Mortgage Case and the Accounting Case were consolidated.

After testimony and other evidence (including papers in the 1900, 1905, 1913 and 1941 cases) the lower court on January 28, 1946 filed a memorandum opinion, and on February 21, 1946, a decree in the consolidated cases. By the decree the bill in the Mortgage Case was dismissed with costs, and the bill in the Partition Case was dismissed as to Mrs. Eney because her father had sold all his interests to the Stewarts. Except as to Mrs. Eney the Partition Case was sustained, a sale ordered and trustees appointed to make sale. From these portions of the decree no appeal was taken.

The decree also requires the appellants to account to a trustee "for two-thirds of the income collected by David Stewart individually or as trustee, or his representatives, from December 8, 1930, from the rents and reversions held in trust" under Item 10, and also "for all amounts of money which the estate * * * has lost through the failure on the part of David Stewart to invest the corpus from redeemed ground rents coming into his hands which were a part of the trust estate" under Item 10, "from the date when said funds came into the hands of David Stewart to the date of this decree"; "all funds so accounted for" to bear interest at six per cent; the decree also appoints James C. Burch trustee to receive from the appellants all funds to be accounted for under the decree, and after deducting expenses to "distribute the balance to such persons as may be entitled thereto" under the decree; in the Accounting Case

costs are to be paid by the appellants, in the Partition Case out of the proceeds. From these parts of the decree Stewart's executor's have appealed.

Appellants' basic contention is Stewart's original assertion that this court had already decided that Item 10 created cross-remainders between the Spurrier children and the grandchildren. Appellants correctly say that if this court did so decide, its decision is binding on the parties in the instant case, even if at variance with prior and subsequent decisions and established rules of construction.

We are satisfied that the opinion in the Heald case is contrary to appellants' contention and is in accord with the words of Item 10 and with familiar methods of construction as to gifts by implication. When the words of a will are of doubtful meaning, or necessarily imply a gift which they do not in terms express, the courts lean toward a construction which avoids an intestacy. When the meaning of the words is clear, and contains no such necessary implication, the courts can not make a new will for the testator to supply an omission and avoid an intestacy.

Perhaps the possible implications in words may be as innumerable as the explications. In the reported cases, however, most gifts by implication fall within a comparatively small number of classes. *Miller, Construction of Wills*, secs. 114-117, 122, 224, 365, 371; *Jarman on Wills* (7th Edition, 1930), Chapter XIX, 597-655. Those in the Heald case are of a familiar type. Item 10 (and other provisions of the will) furnish no basis for implication of cross-remainders between children and grandchildren, but negative any such intent by expressly creating cross-remainders, *i. e.*, survivorship between children alone on death without issue—and by creating cross-remainders by implication between grandchildren alone. Cross-remainders among children who survive negative cross-remainders to children who do not survive, *i. e.*, between children and grandchildren. *Turner v. Withers*, 23 Md. 18, 40-42; *Marbury v. Bouse*, 187 Md.

106, 48 A. 2d 582. "* * * an implication of cross-remainders is to be derived from the expressions used by the testator and not from speculation or conjecture." *Rabbeth v. Squire*, 4 DeG. & J. 406, 413, 414.

Gifts in case of "death without issue" (*i. e.,* at common law, before the Act of 1862, after indefinite failure of issue; since the Act of 1862, after definite failure of issue) may imply a gift to issue (*i. e.,* before 1862, enlarging a life estate, or cutting down a fee simple, to an estate tail). In the Heald case (since the Act of 1862) Item 4 was construed as implying an absolute gift to issue, after death of the life-tenant (Charles) leaving issue but no children. Likewise a gift after death of children may imply gifts to children, *e. g.,* survivorship, *viz.,* cross-remainders among children. Even gifts to heirs after the death of a stranger may imply a gift to the stranger if he survive. But a gift after death of children of A, and a like gift after death of children of B, ordinarily do not imply cross-remainders among the children of A or B or between A and the children of B.

In the Heald case, *supra,* the opinion carefully states that under Item 10 the children take life estates, with survivorship, *i. e.,* cross-remainders, on death without issue, and that "Survivorship by implication would seem to exist among the children of *each* of the Spurrier children [*e. g.,* among Howard, Walter and Ernest, children of William] because of the attempted devise over to the testator's heirs is made to take effect from and after the death of 'said children of said deceased *child*'." (Italics supplied). The opinion will bear no other interpretation, and Item 10 no other construction.

Item 6 likewise creates by implication "survivorship among the children of William, Charles and John" [children of Edward], not between the children and grandchildren of Edward—even if the words quoted be interpreted collectively. 56 Md. 312. The opinion as to Item 6, read in connection with the construction of Item 10 and with the will itself, clearly uses these words, not collectively, but distributively, *i. e.,* as meaning "the

children of William, Charles and John *respectively,*" not "the children of William, Charles *or* John."

It follows, from our interpretation of the opinion in the Heald case construing Item 10, that David Stewart was never entitled to more than one-third of the income of the trust estate under Item 10 and that from the death of Josephine in 1912 to the death of Howard in 1943 he received income to which he was not lawfully entitled. Subject to any applicable defenses, *e. g.,* limitations, laches or lack of parties, he was therefore liable at least to an action for money had and received or the equivalent, an accounting in equity (*Poe on Pleading,* Tiffany Edition, sec. 117), at the suit of anyone whose rents he had wrongfully received.

It also follows that upon the death of Mrs. Brunt in 1930 the trust under Item 10 as to two-thirds of the income—and the *corpus*—immediately terminated, and (as Judge Henderson in effect held) the trust as to the remaining one-third terminated immediately upon Howard's death. At the testator's death his heirs did not take remainders or other interests under the will, but took by inheritance the undisposed of reversion (1) after the death, without issue, of the last survivor of the four Spurriers, and (2) after the death of the last surviving child of each of the four Spurriers. We find no basis for plaintiff's contention that upon Mrs. Brunt's death an intestacy as to income, but not as to *corpus,* occurred. The trust terminated as to two-thirds as completely upon Mrs. Brunt's death as it did as to one-third upon Howard's death.

At the testator's death the reversion was an "equitable fee" (56 Md. 312), but upon termination of the trust as to the whole or any part of the trust estate, the equitable reversion became a present legal fee. The trust estate under Item 10 consisted entirely of real estate, since the directions for investment in "permanent ground rents" effected a conversion of the testator's personal estate into real estate. 56 Md. 308.

Whether a trust of real estate and the duties of the trustee, terminate immediately at the prescribed time for termination of the trust, or continue thereafter for the purpose of distribution and winding up, is often a difficult question. *Chapman v. Baltimore Trust Co.*, 168 Md. 254, 258, 259, 177 A. 285. So long as there remain any active duties to be performed by the trustee, the trust continues. But where all the purposes of a trust have ceased, or are at an end, the absolute estate is in the person entitled to the last use. *In re Hagerstown Trust Co., Executor of Mealey,* 119 Md. 224, 234, 86 A. 982; *Miller on Construction of Wills,* secs. 179, 180. In the instant case no duties of the trustee, express or implied, can continue, since the termination of the trust occurs upon intestacy, *i. e.,* upon failure to make any provision at all for continuation of the trust or the duties of the trustee. The trust terminates immediately, and the legal title to the *corpus* passes to the heirs at the time of the testator's death, as to two-thirds upon Mrs. Brunt's death, as to one-third upon Howard's death.

Even before termination of the trust, plaintiff's suggestion that the trustee had a general power of sale under Items 10 and 11 is untenable. Limited express powers do not necessarily negative implied powers. *Preston v. Safe Deposit & Trust Co.,* 116 Md. 211, 216, 81 A. 523, Ann. Cas. 1913C, 975. But the will must furnish some basis for implication of powers. This will carefully distinguishes between executors and trustees and between limited and general powers. The executors and trustee are not the same persons. The executors' broad power of sale under Item 11 is not a power of the trustee. The detailed provisions of the will, the limited powers of sale under Item 10, and the directions for investment in "permanent ground rents" furnish no basis for implication of any general power of sale.

Plaintiff contends, and apparently the lower court held, that plaintiff's claim is not barred by limitations because it is a claim for an accounting by a trustee of "an express, subsisting and recognized trust" (*Weaver*

*v. Leiman,* 52 Md. 708, 713), *viz.,* that Stewart by the order of June 6, 1933 in the 1913 case became a "general trustee" under Item 10 of the will, and the rents received by him thereafter were collected by him as trustee and misappropriated to his own use. Just how this contention is applicable to rents received after December 8, 1930 but before June 6, 1933 is not clear.

From the facts already stated regarding the 1905 and 1913 cases, it seems clear (1) that Stewart never was a "general trustee" under Item 10 of the will, (2) that under Item 10 the trustee had no duty to collect and distribute rents for the beneficiaries, but was required "to permit them * * * to receive and to collect the rents as they may fall due," and (3) that both before and after June 6, 1933 Stewart openly and consistently repudiated any trust as to collection of income for heirs, by claiming and receiving for himself all income after the death of Mrs. Brunt until the death of Howard. We agree with plaintiff that Stewart could not acquire title "by proclamation," to a non-existent remainder, years before the question became presently material. Nor can the office and the obligations of a trustee be acquired—or lost—by mere misnomer. The status of John M. D. Heald, the two Lindsays and Stewart, as trustees, depends upon the facts regarding the 1905 and 1913 cases, not upon ambiguous or inexact expressions in those proceedings.

The abortive 1900 suit was brought for assumption of jurisdiction of the trust under Item 10 and appointment of a new trustee, *i. e.,* for enforcement of the trust. The 1905 and 1913 cases were statutory proceedings for sale, for reinvestment, of particular ground rents (Art. 16, sec. 252; Act of 1862, ch. 156), *i. e.,* not for enforcement of the trust as such, but for objects beyond the powers of the trustee. The statute is not applicable to trusts as such, but to life estates (legal or equitable) and subsequent interests in land. Resort to the statute was necessary because the trustee had no power (a) to sell any of the "permanent ground rents" or (b) to in-

vest in redeemable rents. Under the statute "all the parties in being" must be "parties to the proceedings" and the sale must "appear to be advantageous to the parties concerned." The link between the statutory proceeding and the trust is that the proceeds of sale must be invested "so as to enure in like manner as by the original grant to the use of the same parties who would be entitled to the land sold."

The 1905 case effected a sale of the Postoffice Avenue ground rent and reinvestment of the proceeds in the Westwood Avenue rents. The 1913 case effected a sale of the Conway Street rents and reinvestment in the Lakewood Avenue rents. In the 1905 case Messrs. Dawson and Stewart, in the 1913 case Thomas J. Lindsay, were appointed trustees to sell. In both cases the reinvestments were made in the name of John M. D. Heald, trustee. Neither case involved the rest of the trust estate under Item 10. Lindsay in 1916, in the 1905 case, and Stewart in 1933, in the 1913 case, were each appointed "substituted trustee," with respect to the Westwood Avenue rents (and the small cash balance) and the Lakewood Avenue rents respectively. With respect to the rest of the trust estate the trustee's naked legal estate descended to his heir at common law (Art. 46, sec. 5) until appointment of a successor (Art. 16, sec. 102). If, however, there was any "general trustee" appointed, it must have been Thomas J. Lindsay and George Carey Lindsay, successfully appointed in the 1905 case in 1916 and 1928. In that view there was no vacancy in 1933 except with respect to the Lakewood rents.

Except in contingencies, which between 1916 and 1933 did not occur, the "general trustee" had no active duties. We may assume, without deciding, that he had power to collect rents for the purpose of paying expenses, if the beneficiaries would not pay such expenses or reimburse him. The testator, however, directed investment in "permanent ground rents," which ordinarily involved no expense to the trustee. Subject to payment of such

expenses, if any, the trustee was required to "permit" the beneficiaries "to receive and to collect the rents." *Mackenzie v. Gerke*, 118 Md. 326, 84 A. 480. It does not appear that John H. or John M. D. Heald, Thomas J. or George Carey Lindsay, or Stewart ever received or claimed commissions on income. The Lindsay firm collected the Westwood Avenue rents, as agents for the beneficiaries, and made collection charges as such. They deducted and paid the premiums on the bond of the trustee (Thomas J. or George Carey Lindsay).

The legal scope of the Stewart orders in 1933, 1939, 1941 and 1942 was narrow. We can not suppose that the City would accept title to the Fayette Street ground rent under the 1940 order. However, when the court originally authorized investment in the Lakewood Avenue redeemable rents, the right of redemption was a term of the investment. We, therefore, think the court could, even on an *ex parte* application, appoint a trustee (both the "general trustee" and the trustee to make sale having died) to convey the rent and to receive the redemption price, subject to further order of the court, for the benefit of the original parties to the case and their successors *pendente lite*, including those whose "equitable fee" had already become in part a legal fee, held in common with the trustee of the one-third still held in trust.

"Whether a trust is subject to the statute of limitations is, to say the least, largely dependent upon the character and terms of the trust." *Tyson v. George's Creek Coal & Iron Co.*, 115 Md. 564, 579, 81 A. 41, 47. At most, only an express trustee is denied the right to plead limitations. *Farmer's Banking & Trust Co. of Montgomery County v. Bender*, 175 Md. 625, 633, 3. A. 2d 743. Recent writers have suggested that express trustees usually are denied the right to plead limitations, not because express trusts are excepted from the statute, but because during performance and until repudiation of the trust by the trustee there is no cause of action and the statute has no bearing. "The true rule with respect to the statute of limitations and express trusts

is more clearly stated as follows: During performance of the express trust there is no cause of action for breach and so the statute of limitations has no bearing on the rights of the *cestui*; but, if the trustee violates the trust and the *cestui* knows of such conduct, or could have learned of it by the use of reasonable diligence, the court will apply the statute of limitations which governs equitable causes of action or an analogous statute concerning legal causes of action. To cause the statute to begin running during the life of the trust there must be some act of repudiation of the trust by the trustee, as where he declines to account to the *cestui*, takes trust income for his own purposes, or sets himself up as the owner of the trust capital." *Bogart on Trusts*, sec. 951; *Woolley v. Stewart*, 222 N. Y. 347, 353, 354, 118 N. E. 847. Referring to the rule that the statute usually is not applicable to express trusts this court said: "But this rule is subject to limitations and restrictions, and whenever a trustee sets up an open, public, adverse claim against his *cestui que* trust, and denies that the trust any longer subsists, or where a trustee recognizes another person as *cestui que* trust, long possession and continued enjoyment of the property under such recognition will be a bar in equity." *Needles v. Martin*, 33 Md. 609, 619. *Cf. Owens v. Crow*, 62 Md. 491, 496.

Stewart never recognized any subsisting trust, except for himself, as to income after Mrs. Brunt's death until Howard's death. He repudiated any such trust for heirs (or their successors) not only by retaining the income from the Lakewood Avenue rents, but by demanding and receiving from the Lindsays the income from the Westwood Avenue rents and by collecting for himself all other rents which had been a part of the trust estate. We do not find any laches or estoppel in the heirs' failure to dispute (or in Mrs. Groverman's formally admitting) Stewart's self-serving assertions made ten days after he acquired the first of the Spurrier interests or in the 1905 or 1913 case before Mrs. Brunt's death. But after Mrs. Brunt's death, for more than two years before

Stewart was appointed trustee, every heir (or successor in interest) knew that he received no income from any part of the trust estate and either knew, or could readily have ascertained, that all the income, including the Lakewood Avenue rents, was claimed and received by Stewart as his own. We think the Statute of Limitation had begun to run before Stewart's appointment and continued to run thereafter as to the Lakewood Avenue rents, as well as the rest of the rents held in trust before Mrs. Brunt's death.

Though the bill prays an accounting only for income collected by Stewart, the lower court held his estate accountable for income not collected by him through failure to reinvest the five sums of $700 (or $750) received by him in 1933, 1939, 1941 and 1942 from redemption of Lakewood Avenue ground rents. We may assume, without deciding, that if these moneys should have been invested and if loss was sustained through negligent failure to invest them, Stewart would have been liable for failure to invest and to ask the court for any necessary authority to do so. Neither a legal duty to invest nor loss through negligent failure to do so is shown, although Stewart was undoubtedly at fault in not reporting his redemptions. We have held that the trust as to two-thirds of the money had terminated before any of the money was received. Two-thirds of the money was therefore immediately distributable to the heirs (or their successors). No claim for such distribution was made or could have been established except by full legal proceedings such as the Partition Case. We are not prepared to hold that it was Stewart's duty, rather than the duty of the heirs, to institute such proceedings on receipt of $700—or $3550.

Nor are we referred to any evidence at all on the question of negligence. Stewart said in his answer to the petition for his removal that sums of $700 were difficult to invest. Referring to the period just before 1933, this court said: "* * * the court is almost impelled to take judicial notice of the then existing economic condition,

for the reason, it may be conservatively stated, that there never was a time in the history of the United States when it was more difficult to secure safe investments with a reasonable income. This statement applies, not alone to real estate investments, but to all classes of investments." *Carey v. Safe Deposit & Trust Co.*, 168 Md. 501, 516, 178 A. 242, 248. For changing reasons this statement has been no less applicable to the period since 1933. It is common knowledge, illustrated in inventories of decedents' estates, that cash in bank, bearing no interest, constitutes a formerly unheard of proportion of the total net worth of many prudent individuals. Some of the reasons for this practice may be applicable to trust estates. Stewart handled this $3550 in the same may he handled much larger amounts of his own money. In the absence of evidence on the subject, no question of negligence is properly before us. We merely hold that failure to invest this $3550 was not, as a matter of law, negligence which caused loss to the heirs.

Appellants deny plaintiff's right to sue in behalf of the "heirs" of the testator or anyone except herself. We may assume, without deciding, that "heirs" meant "successors in interest to heirs," that appellants were not misled, and that if the lower court did not give express prior leave to file such a bill, it gave tacit subsequent assent.

The doctrine of representation has frequently been recognized by this court (*Leviness v. Consolidated Gas Electric Light & Power Co.*, 114 Md. 559, 567-570, 80 A. 304, Ann. Cas. 1913C, 649, and cases cited), but not without limits. *Saunders v. Roland Park Co.*, 174 Md. 188, 193-194, 198 A. 269; *Long v. Long*, 62 Md. 33, 66-68; *cf.* Art. 16, sec. 252. It is applied "in certain cases where plaintiffs may sue as representatives of a class, in behalf of themselves and all others similarly situated, and where defendants may be sued as representing others having similar interests. With respect to plaintiffs the most usual cases are those by creditors on behalf of themselves and others, either in creditors' bills strictly so-called, or

in suits to set aside fraudulent conveyances." *Miller on Equity Procedure,* sec. 40. In its broadest sense the term "creditors' bill" would not include a suit against a solvent defendant by a number of individuals for receipt of moneys belonging to them severally, though in the instant case the similarity of the facts would justify different claimants in uniting in one case, and also justifies consolidation of the Accounting Case with the Partition Case. "The principle that all must be made parties whose interests may be affected by the decree is only departed from where it becomes extremely difficult or inconvenient to enforce the rule." *Nashville & S. Co. v. Orr,* 18 Wall. 471, 473-474, 21 L. Ed. 810.

Neither necessity nor convenience requires that plaintiff, who has a 1/105 interest in the *corpus* of the estate, be permitted to litigate stale claims in behalf of some 36 other persons who may not have wished to pursue their grain of flesh or to risk the expense of the pursuit. *Smith v. Williams,* 116 Mass. 510, 512-513. We need not decide that 100 or 75 or 50 or 25 is or is not too small a number of persons for application of the doctrine of representation. The plaintiff sued 150 defendants (reduced on demurrer to 75) in the Partition Case. All persons who were entitled to share in the Spurrier interests in rents after the death of Mrs. Brunt are parties to the Partition Case or where predecessors in interest (presumably now deceased) to parties. Plaintiff must have known who the predecessors (about ten in number) were and could readily have made their personal representatives parties. This estate has been in the courts intermittently for sixty-six years. As Mr. Justice Story has said, "It is for the public interest and policy to make an end to litigation, or as was pointedly said by a great jurist, that suits may not be immortal, while men are mortal." *Ocean Insurance Co. v. Fields,* Fed. Case No. 10, 406, 2 Story 59.

By the order of April 27, 1945, consolidating the Accounting Case with the Partition Case, the parties to the Partition Case were in effect made parties to the

Accounting Case. As the bill in the Accounting Case seeks an accounting not only with plaintiff but with others entitled, an accounting may be decreed between appellants and any other defendants who may be entitled. *General Equity Rule 31.*

As recovery is limited to parties to the Consolidated Case, accounting with a trustee and appointment of a trustee for this purpose are unwarranted. The Statute of Limitations restricts the accounting with plaintiff to rents received by Stewart within three years of March 27, 1944 and with other parties to rents received within three years of April 27. 1945. None of the parties are entitled to rents received before they succeeded to their interests in the corpus, unless they can show that through administration proceedings or otherwise, they became assignees of rents to which their predecessors in interest were entitled. As appellants get the benefit of the legal defense of limitations, we think they should be charged interest at the legal rate.

> *Decree affirmed in part and reversed in part and cause remanded for passage of a decree in accordance with this opinion; appellants and appellees each to pay their own costs in this court, appellees' costs to be paid proportionately out of the amounts awarded to each in the accounting; costs below to be paid in accordance with the decree appealed from, including any additional costs.*

## ON MOTION FOR EXPLANATION OR MODIFICATION

Appellants have filed a motion for explanation or modification of the opinion and the mandate in certain respects, particularly as to costs. Any prolongation of the unusually long opinion should be avoided, if possible. As to costs it is sufficient to say that the provision for "any additional costs" is not intended to limit the lower

court's discretion to dispose of any costs wastefully or otherwise improperly incurred. No questions as to details, past or future, of what appellants refer to as "the intricate accounting directed by this court" have been before us for decision. If, however, the table of pedigree in appellants' brief is correct (except a typographical error in one fraction), it would seem that disposition of the Partition Case and application of the defense of limitations should make the accounting directed by this court relatively simple.