LOPEZ, ET AL. *v.* LOPEZ, ET AL.

[No. 296, September Term, 1967.]

492

*Decided July 3, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, McWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Ralph F. Berlow* for appellants.

*Henry A. Babcock* for appellees Theodore Miazga and Matilda Miazga.

*Edward P. Camus,* with whom was *John K. Keane, Jr.* on the brief, for appellees, Helen Lopez and Lopez Construction Co., Inc.

Submitted on brief by *Thomas R. Brooks* for appellees Henry F. Long, Jr., National Fence Manufacturing Co., Inc., George A. Leathers and Harold W. Rohrback.

SINGLEY, J., delivered the opinion of the Court.

On 23 December 1961, Alejo Lopez (Alejo), a successful contractor, died domiciled in Prince George's County, as a result of a tragic accident which had occurred on one of his company's construction jobs. Mr. Lopez is no stranger to this Court, since his domestic problems had been before us in *Lopez v. Lopez,* 206 Md. 509, 112 A. 2d 466 (1955), to which some reference should be made. In that case, an appeal from a decree of divorce *a vinculo matrimonii* awarded by the Circuit Court for Prince George's County to Lopez' first wife, Soledad Leirado Lopez (Soledad), the following facts were developed: Alejo and Soledad were both born in Spain. He emigrated to Cuba in 1918; she followed him in 1921 and they were married in Havana on 4 February 1921. Three children were born of this marriage: two sons, Alejo Lopez, Jr. and Francisco Lopez, and one daughter, Ofelia Lopez, now Ofelia Lopez Costa. All three were complainants below in the case now before us: Alejo, Jr., in his own right, and Francisco and Ofelia as next friend of their infant children.

In 1929, Alejo came to the United States, leaving his wife and three children in Cuba, and later, in 1931, arranged for them to return to Spain, promising that as soon as he was able, he would "come to Spain and get his family or else send for them to come to the United States."

Alejo's interest in this project seems to have waned, however. In 1937, he met Helen Grace Cammarata (Helen) in Connecticut; on 26 July 1946, they were married; and five children: Donald Lopez, Alejo Lopez,[1] Carol Lopez, Anthony Lopez and Helena Lopez were born of this marriage.

---

1. Not to be confused with Alejo Lopez, Jr., a son of the first marriage.

In 1947, and again in 1952, Alejo and Helen took title to parcels of Maryland real estate as tenants by the entirety.

In April, 1954, Soledad, the first wife, arrived in the United States, having been preceded by her children, Alejo, Jr., Francisco and Ofelia. She immediately instituted an action for divorce, and on 17 September 1954, was granted a decree *a vinculo*, permanent alimony of $50 per week, and counsel fees of $500. She appealed from the decree, complaining because she was not awarded a share of her husband's personal property, a contention which was rejected by our predecessors because there was no proof that she had made any contribution to her husband's personal estate. On the contrary, there was evidence that Helen had contributed some $3,000 [2] of her own funds to the purchase of the home which she shared with Alejo and toward the establishment of his business, in which Helen contended she was a partner.

On 26 September 1954, a little more than a week after Soledad had obtained her divorce decree, Helen and Alejo were married for the second time, this time in Prince George's County.

Sometime prior to the marriage, Lopez Construction Company, Inc. (the Company) had been organized,[3] and it would appear that subsequent to the marriage, certificates for 320 preferred shares and 395 common shares of the Company's stock were issued to Alejo and Helen as tenants by the entirety. On 12 June 1957, just as they were about to leave for Spain, without changing the form in which the certificates were registered, Alejo and Helen entered into an agreement reciting that the shares were held by them as tenants in common. Although in applications for corporate bonds filed in 1958 and 1962, and in the Company's income tax return for 1959, Alejo had asserted that he was the owner of all of the Company's outstand-

---

2. In the case before us, Helen testified that the contribution was $5,000.

3. In the divorce proceeding, Alejo had been required to deposit all of his stock in Lopez Construction Co., Inc. in escrow to guarantee the payment of alimony *pendente lite*.

ing stock, from 1957 until the time of his death, Alejo had owned 330 shares of the preferred stock and 292½ shares of the common; and Helen owned 160 shares of the preferred and 197½ shares of the common.

On the same day that the agreement was entered into respecting the stock, Alejo executed the will which was ultimately admitted to probate. It left household effects and $3,000 to Helen, and placed the residue of the estate in a trust of which Helen was named trustee, "the corpus and income of [the] estate to be used for the support maintenance of [his] wife Helen G. Lopez, and the support, maintenance and education of [his] said minor children [whom he described in the will as "Alejo, Elaine [Helena], Caroline [Carol], Donald and Anthony", the five children of the marriage to Helen] until each of them shall attain the age of 19 years, or until each of them shall finish high school, whichever occurs last * * *." On 1 June 1976, the trust will terminate, and the estate will be divided into nine equal shares. Helen; each of the five children of the second marriage; Alejo, Jr. (a son of the first marriage); the children of Francisco (another son of the first marriage); and the children of Ofelia (the daughter of the first marriage) will receive one share each.

Helen is named as executrix, and there is a further provision:

"In the event that my said wife, Helen G. Lopez, should predecease me, or die at or about the same time, or become incapacitated, I then nominate and appoint my son, by my first wife, Alejo Lopez, as trustee of my estate and executor of my Last Will and Testament."

On 15 December 1961, just eight days before his death, Alejo entered into a contract for the purchase of the Bunker Hill property, a transaction which proved to be the genesis of the dispute before us. The contract is on a printed form; it recites that a deposit of $5,000 has been received from "Alejo Lopez, president of Lopez Construction Co."; covers 65 building lots in Moyers Park and 13.3622 acres; provides that the purchase price shall be $55,000 computed on a basis of $2,000 per acre, subject to adjustment after survey; is signed, "Lopez Construc-

tion Co., Inc. by Alejo Lopez, president"; and bears the corporate seal of the Company, attested by "Helen Lopez, Secretary." Below Helen's signature and opposite the signatures of the sellers is the date "12/22/61" but it is uncertain (and of no particular consequence) whether this relates to the execution by the purchaser or the sellers. In fact, Helen said she signed "before my husband was hurt." The sellers were, respectively, the trustee of a trust estate and the conservator of the estate of an incapacitated individual, and the latter signed subject to court ratification.

On 11 January 1962, the conservator filed a report of sale in the Circuit Court for Prince George's County; an order *nisi* was entered on 3 April, and ordered published; and in the report, the order, and the publication, the sale was described as having been made to Alejo Lopez, and no notice was taken of the fact that Alejo had died on 23 December 1961. Exceptions to the ratification of the sale were filed by Henry F. Long, Jr., who, after the signing of the contract, had offered $65,000 for the property; the matter was set for hearing on 31 May; and on 1 June 1962, the court entered an order, ratifying the sale to Lopez Construction Co., Inc.

Thereafter, negotiations were commenced with Long, who, unsuccessful in his attempt to block the ratification of the sale of the Bunker Hill property to the Company, was now threatening to take an appeal. An agreement was ultimately reached with Long on 23 June 1962. Briefly stated, Long agreed to pay $55,000, the full contract price, for 51 of the building lots and a 50% interest in the remainder of the property. The Company sold to George A. Leathers, a real estate broker, a 3% interest for $1,500, which was ultimately used for settlement costs. This meant that the Company recovered its $5,000 deposit, and retained a 47% interest in 13 building lots and the acreage, for which it had paid nothing. At the same time, Long agreed to assign 3% of *his* 50% interest to George Leathers, reducing his interest to 47%. On 15 August 1962, Bunker Hill was conveyed to the Company, which in turn, conveyed the 51 building lots and a 47% interest in the remainder to Long; 3% of Long's interest and 3% of the Company's interest to

Leathers;[4] and 9% to Theodore L. Miazga and Matilda M. Miazga, leaving the Company with a 38% interest. Miazga's interest was in satisfaction of the participation promised him by Alejo for his part in negotiating the deal.

When the Company was liquidated in late 1964, its 38% interest was conveyed 15.2% to Helen individually and 22.8% to Helen as trustee, reflecting the approximate proportionate interests of Helen (40.306%) and the trust estate (59.693%) in the Company's common stock. Meanwhile, the owners had been successful in having the 13.3622 acre tract zoned R-10, which made it available for high-rise apartment construction, and on 8 October 1964, entered into a contract to sell the property to Herbert A. Himmelfarb for $22,500 per acre. Because the will contained no power of sale and a portion of the remainder interest was vested in minors, it became necessary to conduct an equity proceeding to convey a marketable title, and Helen filed an *ex parte* petition in the Circuit Court for Prince George's County. It was the institution of this proceeding on 11 February 1965 which brought the appellants into the case.

Initially, their intervention took the form of an objection to the ratification of the sale to Himmelfarb, filed by Alejo Lopez, Jr. (Alejo, Jr.) in his own behalf and by Francisco Lopez (Francisco) as natural guardian of his minor children. Later, they were joined by their sister, Ofelia Lopez Costa (Ofelia) in her capacity as natural guardian of her minor children, with the result that all three of Alejo's children by his first marriage, the appellants in the case before us, who will hereafter be referred to as "the beneficiaries", were active participants in the litigation. The beneficiaries assigned as reasons for their objection to the sale to Himmelfarb the inadequacy of the purchase price, and the allegation that the Company's conveyances to Long, Leathers and Miazga were "in fraud of the beneficiaries under the will" of Alejo.

4. Subsequent to 15 August 1962, Leathers apparently assigned one-half of his 6% interest to Harold W. Rohrback, another real estate broker, and Long conveyed a part or all of his interest to National Fence Manufacturing Co., Inc.

Although the lower court, on 22 April 1965, ratified the sale to Himmelfarb, the beneficiaries moved to set aside the order on the ground that the infant remaindermen had not been properly joined, and their motion was granted on 21 May 1965. An amended petition was then filed by Helen, joining her own children and the children of Ofelia and of Francisco and Alejo, Jr. as defendants. While this was pending, and on 21 June 1965, the beneficiaries instituted another action in equity which sought: (1) to set aside the conveyances of interests in the Bunker Hill property to the Miazgas, to Long, to Leathers, to Rohrback, and to National Fence Manufacturing Co., all of whom were joined as defendants with the Company and Helen, in her individual capacity and as trustee; (2) to require a reconveyance of the Bunker Hill property to Helen, as trustee of Alejo's estate; (3) to determine that title to two parcels of real estate purchased by Helen and Alejo as tenants by the entireties before they were validly married was vested in Alejo at the time of his death; (4) to require an accounting by Helen as trustee; and (5) to remove Helen as trustee. Helen and her co-defendants answered, generally denying the allegations of the beneficiaries' bill of complaint.

In the interim, guardians *ad litem* had been appointed for the infant defendants in the proceeding instituted by Helen for the ratification of the sale to Himmelfarb; answers had been filed; and counsel for the guardians *ad litem* obtained independent appraisals of Bunker Hill. The two cases, the first brought by Helen for the ratification of the sale to Himmelfarb, and the second, brought by the beneficiaries which challenged the validity of the Company's sale to Long and the conveyances to Leathers and Miazga, were consolidated on 1 October 1965. After the trial of the case was concluded, an appeal from the order ratifying the sale to Himmelfarb was withdrawn with the result that the appeal before us relates solely to the second suit, instituted by the beneficiaries, although by stipulation the proceeds of the Himmelfarb sale are being held in escrow, pending the outcome of this appeal.

The beneficiaries urge the reversal of the orders entered by the court below, ratifying the conveyances to Long, Leathers

and Miazga; determining that Helen is the sole owner of the two parcels of real estate which she held jointly with Alejo; appointing Henry F. Leonnig substitute trustee under Alejo's will; determining that the Bunker Hill property was an asset of the Company, and not of Alejo's estate; and decreeing that Helen owned individually 160 shares of the Company's preferred stock and 197½ shares of its common stock at the time of Alejo's death. The beneficiaries assign the following reasons for the reversal of the orders, which we have rephrased and renumbered in an attempt to achieve brevity and clarity:

i. The burden of proof was on Helen, as executrix and trustee, and not on the beneficiaries, to remove any doubts and obscurities existing in connection with her transactions.

ii. The contract for the purchase of the Bunker Hill property was entered into by Alejo for his own account and not for the account of the Company and the property was therefore an asset of Alejo's estate.

iii. Miazga has the burden of proving the fairness and propriety of the conveyance to him of a 9% interest in Bunker Hill because the interest was controlled and conveyed by a trustee whose attorney he was.

iv. Since the will named Alejo, Jr., as successor trustee, upon Helen's resignation Alejo, Jr., should have been appointed to give effect to Alejo's intentions.

v. It was error for the court to accept Helen's resignation and to appoint a substitute trustee without requiring a full accounting from Helen.

vi. When the beneficiaries produced evidence that Alejo claimed to be the sole owner of the stock of the Company, this raised a presumption which must be rebutted by Helen by proving true ownership from the corporate records.

vii. The parcels of real estate conveyed to Alejo and Helen as tenants by the entirety prior to their valid marriage vested sole ownership in Alejo, who provided the full consideration.

We shall now consider each of these contentions, adding such additional facts as may be required for amplification.

i.

*The burden of proof was on Helen, as executrix and trustee, and not on the beneficiaries, to remove any doubts and obscurities existing in connection with her transactions.*

Although Helen makes no point of this, it should be noted that the beneficiaries brought their bill of complaint against Helen individually, and in her capacity as trustee, and not as executrix. Their prayers for relief are directed against Helen as trustee. Under this posture of the case, Helen's transactions as executrix are not before us, except tangentially.

Helen's position, as stated in her brief, is that the beneficiaries, who were the plaintiffs below in the case attacking Helen's administration of the trust, have the burden of proving that they are entitled to relief; that if "doubts and obscurities" were raised by the beneficiaries, they were resolved by testimony offered by or in behalf of Helen; and that a consideration of each of the challenged transactions will bear this out. Helen's position is well taken.

> "A beneficiary seeking to obtain relief for a breach
> of trust must plead and prove facts which show the
> existence of a trust duty, the failure of the trustee to
> perform it and that consequently the court should
> grant the requested remedy. * * * If the cestui shows
> a prima facie case, the burden of contradicting it or
> showing a defense will shift to the trustee." Bogert,
> *Trusts and Trustees* (2d Ed. 1962) § 871 at 89-90.

Putting this another way, the person who challenges the conduct of a trustee, must first allege that the trustee has a duty and has been derelict in the performance of this duty, and offer evidence in support of this allegation. Then, and not until then, does the trustee have the burden of rebutting the allegation. In the absence of such proof, there is no duty on the trustee to prove a negative: *i.e.,* that he has not been derelict in the performance of his duties.

We think that the beneficiaries' reliance on "doubts and obscurities" as a reason for shifting the burden of proof is misplaced. This is a concept peculiarly applicable to trust account-

502

ing, *Berlage v. Boyd,* 206 Md. 521, 532, 112 A. 2d 461 (1955);
*Hatton v. Weems,* 12 G. & J. 83, 109 (1841); *Bogert, supra,*
§ 962 at 11, and there is no doubt that a trustee who fails to
keep proper accounts has the burden of proving entitlement to
the credits he claims. *Restatement (Second), Trusts* (1959) §
172, comment b at 377; *Berlage v. Boyd, supra.* Here the prin-
cipal thrust is against Helen's transactions.

ii.

*The contract for the purchase of the Bunker Hill property*
*was entered into by Alejo for his own account and not for the*
*account of the Company and the property was therefore an asset*
*of Alejo's estate.*

The beneficiaries mount a dual argument in support of this
contention. First, they say that the ribbon copy of the Bunker
Hill contract in its first two lines recited the receipt of a $5,000
deposit from "Alejo Lopez" and that the identifying phrase
"president of Lopez Construction Co." was inserted by the
use of carbon paper and consequently must have been added at
some unspecified later date. In any event, they say that the
identifying phrase was merely *descriptio personae.* They stress
the fact that the sale was originally reported to the court by one
of the vendors as having been made to Alejo as an individual,
and that this posture was maintained almost to the conclusion
of the ratification proceeding which leads them to the conclusion
that the sale was made to Alejo.

The beneficiaries' second argument rests on the assumption
that Alejo was the sole owner of the Company, or, if he was
not the sole owner, that he had, in fact, such dominion and con-
trol over the Company's business and affairs that the Company's
interests and Alejo's interests were synonymous, and that the
court should ignore the corporate entity, as was done in
*Bauernschmidt v. Bauernschmidt,* 101 Md. 148, 161-62, 60 A.
437 (1905).

We take a somewhat different view of the matter. To us, a
contract signed "Lopez Construction Co., Inc., Alejo Lopez,
president" to which the corporate seal has been affixed and
attested "Helen Lopez, secretary" is clearly the contract of the
corporation, since Alejo and Helen signed in their representative

capacities. The treatment accorded similarly executed commercial paper is analogous. *Security Insurance Co. v. Mangan,* 250 Md. 241, 242 A. 2d 482; Uniform Commercial Code § 3-403(3), Code (1957, 1964 Replacement Volume) Art. 95B § 3-403(3). The ratification proceeding was conducted by the conservator, who may well have been unaware of Alejo's death.

Nor are we persuaded that this is a case where the corporate entity should be ignored. At first blush, *Bauernschmidt v. Bauernschmidt, supra,* appears to be apposite. There, in an equity case brought to resolve conflicting contentions with respect to a decedent's assets, the court held that property owned by a corporation of which the decedent was the sole stockholder (save for qualifying shares held by the decedent's sons) should be regarded as the individual property of the decedent. Brune, *Maryland Corporation Law and Practice* (Rev. Ed. 1953) at 438-39, says of *Bauernschmidt,* "This case seems to establish a dangerous precedent and will undoubtedly lead to confusion if extended beyond its own particular facts."

We think the correct view is that stated in *Winand v. Case,* 154 F. Supp. 529, 540 (D. Md. 1957), where Judge Watkins said:

> "This court sees no reason to fail to follow the general rule that a corporation, even if owned solely by one person, will be regarded as an independent person distinct from its shareholders subject to exception only when necessary to prevent fraud or to enforce a paramount equity."

This is an almost exact repetition of the rule enunciated for this Court by Parke, J., in *Carozza v. Federal Finance Co.,* 149 Md. 223, 238, 131 A. 332 (1925) where the Maryland authorities, including *Bauernschmidt,* are assembled in support of the proposition. *Accord,* Brune, *supra,* § 371 at 433-34; and cases collected in footnotes; *Lenman, Exec. v. Kairys, Exec.,* 217 Md. 359, 365, 142 A. 2d 546 (1958). *But cf., Waller v. Waller,* 187 Md. 185, 191, 49 A. 2d 449 (1946). We agree with the chancellor's conclusion that the Bunker Hill contract was entered into by the Company, and see no reason why the corporate entity should be swept aside.

504

### iii.

*Miazga has the burden of proving the fairness and propriety of the conveyance to him of a 9% interest in Bunker Hill because the interest was controlled and conveyed by a trustee whose attorney he was.*

For the beneficiaries to succeed in sustaining this contention, they must either show that this is an instance where the corporate entity should be disregarded, which has heretofore been discussed and rejected in ii, or that Miazga took title from Helen as trustee or as executrix.

The Company entered into a contract for the purchase of Bunker Hill on 15 December 1961, eight days before Alejo's death on 23 December. Because of the unsatisfactory financial situation of the Company, which was further complicated by the filing of tax liens against the Company's bank accounts by the Internal Revenue Service, and the exceptions which Henry F. Long, Jr., had entered against the ratification of sale, the Company determined to negotiate a settlement with Long, which resulted in its interest being reduced to a 50% interest in 13 building lots and the 13.3622 acre remainder of the tract. On 15 August 1962, a 3% interest in the lots and the tract was conveyed by the Company to Leathers for a nominal consideration of $1,500, in payment for services to be rendered by Leathers in the development of the property and a 9% interest was conveyed by the Company to Theodore L. Miazga and Matilda Miazga, thus reducing the Company's participation to 38%.

. There was uncontroverted testimony that Miazga had been Alejo's lawyer for many years; had incorporated the Company in 1954, and had since represented it; had been instrumental in interesting Alejo in the Bunker Hill property; had acted for the .Company in the negotiations which led to the purchase of the tract; and, after Alejo's death, and while proceedings for the ratification of the sale were still pending, had arranged for most of the low lying portions of the property to be brought to grade with some 200,000 cubic yards of fill dirt without cost to the Company. .

Miazga testified that he had made no charges to the Company

for services rendered with respect to Bunker Hill, because Alejo had promised him a 10% participation in the event the Company acquired the property. Miazga's testimony respecting this arrangement was not denied by Helen. The reduction from a 10% participation to a 9% participation was apparently voluntary on Miazga's part, and the joinder of Matilda Miazga as a grantee of the 9% interest was explained by Miazga as being in compliance with their partnership arrangement.

From the foregoing, it can be seen that Miazga took title from the Company and not from Helen as trustee. Transactions arising out of an attorney-client relationship are by no means insulated from scrutiny or challenge, and when challenged are prima facie void, thus imposing on the attorney the burden of proving understanding on the part of his client, fairness and the absence of undue influence and deception. *Hughes v. McDaniel,* 202 Md. 626, 632-33, 98 A. 2d 1 (1953) ; *Baker v. Otto,* 180 Md. 53, 22 A. 2d 924 (1941). In the present case, neither Helen nor the Company is challenging the propriety of Miazga's compensation which Helen regarded as fair. There is nothing in the record before us which so much as intimates that there was no arrangement between Alejo and Miazga for Miazga's participation; that Miazga did not perform services of a substantial character; or that the benefits which Miazga will enjoy amount to anything more than reasonable compensation for his services.

We do not agree with the beneficiaries' suggestion that Miazga, under these circumstances, had the burden of proving the propriety and fairness of the transaction. Assuming, however, that Miazga's testimony and testimony offered in his behalf was in response to an attack mounted by the beneficiaries, we are satisfied that there was ample evidence to support the chancellor's determination "that the 'Miazga' transaction be * * * ratified."

iv.

*Since the will named Alejo, Jr., as successor trustee, upon Helen's resignation, Alejo, Jr., should have been appointed to give effect to Alejo's intentions.*

On 14 June 1967, Helen resigned as trustee under Alejo's

will, submitting her resignation in open court. In an order entered on the same day, the chancellor provided that Alejo, Jr., should not be appointed substitute trustee. On the same day, acting under Maryland Rule V82, which authorizes the appointment of a substitute trustee to fill a vacancy caused by resignation, the court appointed as substitute trustee Henry F. Leonnig, Esq., who was a stranger to the litigation, and presumably to the parties. An examination of the transcript discloses that the beneficiaries' effort to persuade a corporate trustee to qualify in Helen's stead was unsuccessful, largely because of the atmosphere of contention which existed.

The beneficiaries say that this was an improper frustration of Alejo's intentions as expressed in the will. We are not persuaded by this argument. The provision of the will relating to succession to the trusteeship is rather unusual:

> "In the event that my said wife, Helen G. Lopez, should predecease me, or die at or about the same time, or become incapacitated, I then nominate and appoint my son, by my first wife, Alejo Lopez, as trustee of my estate and executor of my Last Will and Testament."

It is readily apparent that no provision is made for succession in the event of Helen's *resignation*. It is somewhat curious that a literal reading of the language would lead one to conclude that Alejo, Jr., was to succeed Helen only if: (1) Helen predeceased Alejo; (2) Helen died "at or about the same time" as Alejo; or (3) Helen became incapacitated.

Concededly, in an appropriate case, similar language might support a construction that it was the testator's intention that the successor trustee was to step into the trusteeship regardless of the reason why the office became vacant. Since the language of the will is unclear, we cannot say that the conclusion reached by the chancellor in the exercise of the discretion with which he is vested was improper. The tensions which have developed within the family might well have called for the removal of Alejo, Jr., had he been appointed. *Polk v. Linthicum,* 100 Md. 615, 60 A. 455 (1905): *Bogert, supra,* § 527 at 374-78; Scott, *Trusts* (3d Ed. 1967) § 107 at 840; *Restatement (Second),*

*Trusts* (1959) § 107 at 235. *But compare Mangels v. Tippett,* 167 Md. 290, 298-300, 173 A. 191 (1934). The situation clearly justified the appointment of an independent and impartial trustee.

v.

*It was error for the court to accept Helen's resignation and to appoint a substitute trustee without requiring a full accounting from Helen.*

In the prayer for relief appended to their bill of complaint, the beneficiaries asked that an order be entered directing Helen to provide the beneficiaries "with a full and complete account of [her] receipts and disbursements as trustee." The defendants filed as an exhibit in the case an "Annual Account of Assets of Helen Lopez, Trustee" which appears to account for the assets which Helen received as trustee in the distribution of Alejo's estate, to account for income from real estate commencing with the date of Alejo's death, and to detail the trust's receipts and disbursements from 1 January 1962 to 30 April 1966.

The court's order dated 14 June 1967, which was approved as to form by counsel for the beneficiaries, made no provision for another or further accounting, and it is this omission about which the beneficiaries now complain. In this connection, it is interesting to recall the colloquy which took place between the court and counsel at the conclusion of the case:

"THE COURT: As far as the [third prayer for relief] on the accounting, are you asking for more than has been given now?

MR. BERLOW [counsel for the beneficiaries]: Yes.

THE COURT: Because there would be an accounting between Mrs. Lopez and the substituted trustee. She would have to account to the substituted trustee for the stewardship of the trust from the time she became trustee up to the present time, as I understand it. Is there any question about that?

MR. CAMUS [counsel for Helen]: No "

The record contains no indication that counsel for the beneficiaries demurred.

Counsel for Helen say that under these circumstances, the beneficiaries could have made a timely motion for a correction of the decree if the omission was inadvertent, as provided for by Maryland Rules 671 a and 681, *Bell v. Shifflett,* 249 Md. 104, 238 A. 2d 533 (1968) and that moreover, in an order entered 31 January 1968, in which the lower court assumed jurisdiction over the administration of the trust, Helen was ordered to render a full accounting, which makes the question moot. This order, of course, is not before us in the present case.

Without further consideration of the several contentions, it is our view that the question respecting the accounting is not before us on this appeal, and that the beneficiaries can achieve the result they seek by excepting to the administration account filed by Helen as executrix in the orphans' court if they have reason to do so, or by moving under Maryland Rule V74 g, which provides for an accounting by a trustee of a trust administered under court jurisdiction.

vi.

*When the beneficiaries produced evidence that Alejo claimed to be the sole owner of the stock of the Company, this raised a presumption which must be rebutted by Helen by proving true ownership from the corporate records.*

Of all the points raised by the beneficiaries, this is the least troublesome. The chancellor found, from an examination of the stock certificates, that on 12 June 1957, when Alejo and Helen entered into the agreement which changed their ownership of such of the Company's stock as they held as tenants by the entirety to a tenancy in common without requiring a reissuance of the certificates, they owned 320 shares of the preferred stock of the Company and 395 shares of its common stock. As a result of the agreement, Alejo became the beneficial owner of 160 shares of the preferred and 197½ shares of the common stock, and Helen had a beneficial interest in the same number of shares of stock of each class. The administration account which

Helen filed as executrix of Alejo's will shows that she accounted for 330 shares of preferred stock and 292½ shares of common stock, owned by Alejo individually at the time of his death. At the time of Alejo's death, Helen still owned 160 shares of preferred and 197½ shares of common. The increase in Alejo's preferred shares from 160 to 330 and in his common shares from 197½ to 292½ is explained by the chancellor's finding that on 12 June 1957, Alejo owned 170 shares of preferred stock and 95 shares of common stock in his individual capacity. While the implementation of the 1957 agreement was technically deficient, in that stock powers had not been signed, Helen chose to be bound by the agreement, and did not claim ownership of 320 shares of preferred and 395 shares of common, which she might have done.

The beneficiaries lay stress on financial statements of the Company filed with the Company's bonding company in 1958 and 1962, in which Alejo, who prepared the statements, represented that he was the owner of 100% of the stock of the Company and on the Company's U.S. income tax return for the Company's fiscal year ended 30 November 1960, where a similar statement was made by Alejo. We do not regard these as controlling since Helen produced evidence which proved the incorrectness of these statements and that the true situation as to stock ownership was that set out in the preceding paragraph.

The beneficiaries now insist that the best evidence of stock ownership was the stock certificate book, or the stock ledger, and not oral testimony or the stock certificates themselves, which were offered in evidence. Helen counters with the argument that the Company's attorney had offered to produce the stock ledger for examination by the beneficiaries at the time his deposition was taken, and that in any event, the beneficiaries had subpoenaed the ledger and could have offered it in evidence, had they chosen to do so.

We see no reason to disturb the chancellor's finding with respect to Helen's ownership of 160 shares of the Company's preferred stock and 197½ shares of its common stock.

vii.

*The parcels of real estate conveyed to Alejo and Helen as tenants by the entirety prior to their valid marriage vested sole ownership in Alejo, who provided the full consideration.*

The beneficiaries question the true ownership of two parcels of real estate. The first parcel was conveyed in 1947 to "Alejo Lopez and Helen Lopez, his wife, as tenants by the entirety, the survivors of them. . . ."; the second parcel was deeded in 1952 to the "party(ies) of the second part ["Alejo L. Lopez and Helen G. Lopez, his wife"] * * * as Tenants by the Entirety." [5] Alejo's and Helen's marriage was clearly invalid prior to the second ceremony in 1954. The beneficiaries claim that both parcels were owned solely by Alejo Lopez at the time of his death and that title should have passed to the trust under his will. They argue that title to properties conveyed to parties as husband and wife, when there was no valid marriage relationship, should be vested in the party who provided the consideration, in this case Alejo. Helen, while admitting that tenancies by the entirety were not created, contends that an intent to create rights of survivorship has been shown, sufficient to vest title in Helen, as the survivor of Alejo.

In our view, Helen must prevail. We are here dealing with deeds which convey property to the grantees as husband and wife. Had they been validly married, a tenancy by the entirety would have been created. *Wolf v. Johnson,* 157 Md. 112, 145 A. 363 (1929); *Brewer v. Bowersox,* 92 Md. 567, 573, 48 A. 1060, 1063 (1901). However, a tenancy by the entirety can only be created when the parties stand in relationship of husband and wife at the time of the grant to them, *Hurd v. Hughes,* 12 Del. Ch. 188, 109 A. 418 (1920); *McNitt v. McNitt,* 230 Mich. 303, 203 N. W. 66 (1925). Absent such a relationship, the attempt to create a tenancy by the entirety fails. Generally, in the case of a deed conveying property to grantees as husband and wife who are in fact not married, there is a presumption favoring tenancies in common, but this presumption will

---

**5.** This is the wording of the habendum clauses; the granting clauses both read "to Alejo Lopez and Helen Lopez, his wife."

yield to the showing of a contrary intent. *Michael v. Lucas,* 152 Md. 512, 137 A. 287 (1927). *Compare, Mitchell v. Frederick,* 166 Md. 42, 170 A. 733 (1934) *with Donnelly v. Donnelly,* 198 Md. 341, 84 A. 2d 89 (1951). In the instant case, we regard Alejo's attempt to take title as tenants by the entirety as a sufficient showing of his intention to create a right of survivorship, and the presumption favoring a tenancy in common must yield to a joint tenancy. Casner, *American Law of Property* (1952) § 6.6 at 23-24; Kepner, *The Effect of an Attempted Creation of an Estate by the Entirety in Unmarried Grantees,* 6 Rutgers L. Rev. 550 (1952).

For authority in support of the rule that a subsequent marriage does not convert a joint tenancy or a tenancy in common into a tenancy by the entirety, *see* 1 Tiffany, *Real Property* (2nd Ed. 1920) § 194 at 646-47 and cases cited in footnote 7.

The beneficiaries argue that *Hutson v. Hutson,* 168 Md. 182, 177 A. 177 (1935) is controlling. We disagree. *Hutson* involved the wife's concealment of a prior undissolved marriage. This fraud was held to have negated any intent by the husband to confer on the putative wife a right of survivorship in property previously owned by him alone. The entire conveyance was set aside, and at the same time this Court pointed out that "[T]he case differs from those cases in which both parties, knowing they are not married, yet hold themselves out as husband and wife, and take title to property as tenants by the entireties." 168 Md. at 189. In the instant case, there was no fraud on the part of Helen which would support the application of the *Hutson* rule. *See also, Donnelly v. Donnelly, supra,* 198 Md. at 346-47.

For the reasons stated, we find no error in the lower court's disposition of the case.

> *Orders affirmed; costs to be paid by appellants.*