## PAUL BURTON YOUNG *v.* NAOMI BERTHA YOUNG

[No. 1052, September Term, 1976.]

*Decided September 9, 1977.*

The cause was argued before MOYLAN, POWERS and MOORE, JJ.

*Thomas H. McCarty* for appellant.

*Stuart J. Snyder* for appellee.

MOORE, J., delivered the opinion of the Court.

The parties to this appeal are a divorced couple who married each other when the wife was not *yet* divorced from her first husband. Two years after they learned the correct date of the wife's decree, they remarried. In the interim, they had acquired a matrimonial residence as "tenants by the entireties." Ten years after their remarriage, they were divorced. The former wife thereupon filed a bill of complaint for the sale of the property in lieu of partition. The Circuit Court for Anne Arundel County (Childs, J.), after a hearing and the filing of a written opinion, entered a decree appointing trustees to sell the property. It was also ordered that the net proceeds of sale be divided equally but that the former husband's share be increased by one-half of the amounts he expended for taxes, mortgage amortization and interest from the time of the divorce to the date of settlement under the judicial sale. For the reasons set forth, we affirm.

I

Naomi and Paul Young first came to know each other in 1960 or 1961 when they were married to different spouses. They lived together in Baltimore County for a time and in the fall of 1963 they moved to 804 Geis Circle, Glen Burnie, Anne Arundel County, a single-family dwelling. Finally, on April 3, 1964, they were united in marriage in a civil ceremony at the Court House in Towson, Maryland. The application for marriage license, signed by Paul, described his own marital status as "divorced on April 15, 1963" and Naomi's as "divorced on March 26, 1964." The latter date, according to her testimony, was the day when she appeared before an examiner in the Circuit Court for Baltimore City in uncontested divorce proceedings which she had commenced against her first husband. It was her understanding, she testified, that her decree of divorce was signed on the day of the hearing. After the marriage, on May 20, 1964, the parties acquired the leasehold and ground rent

interests in the single-family dwelling in which they had been living. The recitals in the deeds stated that the property was conveyed to them "as tenants by the entireties, their assigns, *the survivor of them* and the survivor's personal representatives and assigns. . . ." (Emphasis added.)

In October 1964, Naomi received in the mail a communication from her attorney in the Baltimore City divorce proceedings, enclosing a copy of the final decree which was dated September 11, 1964. She testified that her husband was at home when this letter was received and that they were both "upset and excited." Immediately contacting her attorney by telephone, she was told that her marriage to Paul was null and void and that they should be remarried. Called as a witness, the attorney testified that although Naomi's decree of divorce was supposed to have been signed in March 1964, her former husband had failed to pay the court costs and the entry of the decree was consequently delayed until September 11, 1964. ⁻

Despite the knowledge of the invalidity of their marriage, the parties continued to live together in the marital abode as husband and wife. Each testified that neither felt impelled to participate in a second ceremony until August 12, 1966, when they were remarried [1] at the Court House in Towson.

The relationship between them thereafter was marked by difficulties and discord. Paul's three children by his former marriage lived with them, as did for a time Naomi's child by her first marriage. She also returned to work in 1967 at the Westinghouse Electronics Corporation where she was employed as an electronics operator, earning close to $3 per hour; and her employment was a bone of contention. The parties weathered periods of separation. She left the home for as long as three months in 1968 and six months in 1969. On or about November 15, 1972, their separation became permanent. According to her testimony, living conditions became intolerable because of Paul's temper.

---

1. Paul testified that he agreed to marry Naomi after she had informed him that she was pregnant. She later aborted the child.

She testified: "We couldn't get along at all and Paul was constantly raving and he was a beater and I just couldn't take it any longer. . . . He liked to beat on women." [2]

After her departure, she attempted, on one occasion, to return for some of her personal belongings but he prevented her from doing so. Naomi testified that Paul continued in the exclusive occupancy and use of the house after she left and that, as of a year later, he was living there with his three children, another woman and the latter's two children.

She maintained that the down payment on the house in the sum of $234 was made from their joint savings, that mortgage payments and improvements to the property were financed through their joint earnings and performed by their joint efforts but that she made no contribution to the mortgage payments, taxes and insurance after leaving him in 1972. Paul, on the other hand, insisted that Naomi had made no contribution toward the purchase of the house, nor to the house payments and improvements, and that she spent all of her earnings on herself.

In his answer to Naomi's bill for a sale of the property, he asked the court to declare that she held "said real property in trust" and that she be required to reconvey it to him. These requests were grounded upon claims of fraud on the part of Naomi in connection with the parties' first marriage — consisting of alleged false statements that she was then unmarried, willfully made to deceive Paul into acquiring the house as tenants by the entireties.

On appeal, the former husband challenges the chancellor's decree ordering the sale of the property and he posits four separate assignments of error.[3] In our judgment, upon a careful review of the record and the applicable law, the case

---

**2.** Naomi did not commence divorce proceedings until 3 years later. She obtained a decree *a vinculo matrimonii* on February 9, 1976.

**3.** The claimed errors are the chancellor's findings: (1) that appellant failed to show fraud to support either a constructive or resulting trust; (2) that the parties became tenants in common after their divorce on February 9, 1976; (3) that appellant intended to make a gift to appellee (a finding not made by the chancellor); and (4) that appellant had caused an ouster of appellee from the property in 1972.

reduces itself to two fundamental issues: (a) Under all the circumstances, what was the effect of the conveyance to Naomi and Paul as tenants by the entireties when they were not in fact married? and (b) If Naomi acquired an interest in the property, to what extent, if at all, should she be charged with contributions on account of taxes, improvements, mortgage amortization and interest payments upon a judicial sale?

## II .

At the time of the conveyance to the parties of the subject property "as tenants by the entireties" in 1964, they were not legally married. A tenancy by the entireties can be created only when the grantees stand in relationship of husband and wife *at the time* of the conveyance to them, and absent such a relationship, an attempt to create such tenancy must fail.[4] *Lopez v. Lopez*, 250 Md. 491, 510, 243 A. 2d 588 (1968); *Hutson v. Hutson*, 168 Md. 182, 188, 177 A. 177 (1935); *Mitchell v. Frederick*, 166 Md. 42, 48, 170 A. 733 (1934). The subsequent marriage, or, as in this case, remarriage, of the grantees of real property does not convert their ownership into a tenancy by the entireties. *Schwarz v. United States*, 191 F. 2d 618, 621 (4th Cir. 1951); *Lopez v. Lopez, supra*, 250 Md. at 511. Clearly, however, a deed which is not effective to create a tenancy by the entireties is not a nullity, unless fraud is established. *Hutson v. Hutson, supra*. In the absence of fraud, the effect of the attempted conveyance to Naomi and Paul in 1964 as tenants by the entireties was to create either a joint tenancy or a tenancy in common.

Section 2-117 of the Real Property Article of the Annotated Code of Maryland (1974) establishes a presumption against joint tenancy "unless the deed, . . .

---

4. The Court of Appeals in Schilbach v. Schilbach, 171 Md. 405, 189 A. 432 (1937) defined a tenancy by the entireties as "essentially a joint tenancy, modified by the common law theory that husband and wife are one person. . . . Except for the fact that it cannot be defeated, during their lives, without the joint action of both, the same rules of law apply to it as to any other cotenancy." *Id.* at 407-08.

expressly provides that the property granted is to be held in joint tenancy." Joint tenancies in Maryland are thus not favored legislatively but they are, of course, recognized and, in their creation, the words "joint tenants" or "joint tenancy" need not be used. As Chief Judge Murphy of the Court of Appeals, specially assigned, stated in *Gardner v. Gardner*, 25 Md. App. 638, 335 A. 2d 157 (1975), "the statutory requirement is only one of clear manifestation or intention and not of particular words." *Id.* at 643. *See Alexander v. Boyer*, 253 Md. 511, 253 A. 2d 359 (1969); *Register of Wills v. Madine*, 242 Md. 437, 219 A. 2d 245 (1966); *Boyd v. Boyd*, 24 Md. App. 497, 332 A. 2d 328 (1975). The principal characteristic of a joint tenancy is the right of survivorship and the specific expression in a deed of such a right is "a clear indication of an intention to create a joint tenancy." *Gardner, supra*, 25 Md. App. at 642; *Mitchell v. Frederick, supra*, 166 Md. at 47; *cf. Donnelly v. Donnelly*, 198 Md. 341, 84 A. 2d 89 (1951).

In the instant case, the right of survivorship was explicitly stated. As previously noted, the deed recited that the grantors conveyed the property to "Paul Burton Young and Naomi Bertha Young, his wife, as tenants by the entireties, their assigns, the *survivor* of them. . . ." (Emphasis added.) The parties thus took title to the property as joint tenants and not as tenants in common.

We reject Paul's contention that there was fraud on the part of Naomi and that she held her interest under a constructive or resulting trust. The chancellor held that Paul had failed to prove fraud. This finding is not clearly erroneous. Maryland Rule 1086. Indeed, we think the record abundantly supports his conclusion that, "The totality of the circumstances indicate the presence of good faith in [Naomi's] actions;" and we are impressed with the court's assessment of Naomi's credibility in stating, "The sincerity of [Naomi's] belief that she was once again free to remarry is not to be doubted."

Appellant's reliance upon *Schwarz v. United States, supra*, and *Hutson v. Hutson, supra*, is misplaced. Both cases involved the fraudulent concealment by one spouse of a prior

undissolved marriage. In the instant case, there was no fraud on the part of Naomi which would support the application of the *Hutson* holding that the entire conveyance be set aside nor of the *Schwarz* finding that a court of equity would decree a constructive trust in favor of the defrauded spouse. To the extent that *Schwarz* also speaks of a resulting trust in favor of the spouse who put up the purchase price, it is also inapposite. Here, as the chancellor found, the down payment was jointly made.[5] In addition, under the circumstances of (a) the remarriage of the parties in 1966 and (b) their cohabitation as husband and wife for an additional six-year period, we would hold the former husband not entitled to assert a resulting trust, even had he alone contributed the purchase price. *See Mountford v. Mountford*, 181 Md. 212, 218, 29 A. 2d 258, 262 (1942), *citing*, *Dixon v. Dixon*, 123 Md. 44, 55, 90 A. 846 (1914), where the Court of Appeals stated:

> "Thus, where a person purchases land and pays the consideration with his own money, but causes the title to be placed in the name of one to whom the purchaser is under a natural or moral obligation to provide, such as in the case of parent and child, *or husband and wife,* no presumption of a resulting trust will arise, but will be regarded *prima facie* as a gift or an advancement for the benefit of the nominal purchaser." (Emphasis added.)

### III

The remaining principal issue involves Paul's contention that, if his former wife has a valid cotenancy, he is entitled to contribution from her for the small down payment of $234, for mortgage payments, taxes and insurance from 1964 through 1976 aggregating $17,250 and for improvements to the property in the sum of approximately $4,500.[6]

---

5. *Infra* at 8-10.

6. Club Room $500; carpet $300; fence $300; room addition $175; patio deck $200; landscaping $450; aluminum siding $850; inground pool $1,025; fireplace $200; bathroom $200 and central air-conditioning $300.

The Maryland rule of law with respect to contribution is that when one of two or more co-owners of an equity of redemption makes payment upon the mortgage debt and that payment redounds to the benefit of a co-owner or owners, the payor is entitled to receive contribution from his cotenants to the extent that he has paid their share. *Aiello v. Aiello*, 268 Md. 513, 518-19, 302 A. 2d 189 (1973); *Pino v. Clay*, 251 Md. 454, 456-57, 248 A. 2d 101 (1968); *DiTommasi v. DiTommasi*, 27 Md. App. 241, 255, 340 A. 2d 341 (1975). Similarly, one cotenant is entitled to contribution from another for necessary repairs and improvements made with the assent of the other or without such assent when the repairs are necessary for the preservation of the structures on the land. *Woodcock v. Pope*, 154 Md. 135, 147, 140 A. 76 (1928). *Accord, Colburn v. Colburn*, 265 Md. 468, 477, 290 A. 2d 480 (1972); *DiTommasi v. DiTommasi, supra*, 27 Md. App. at 262-63.

Notwithstanding the viability of these Maryland rules, we find them inapplicable to the instant case for the reason that the chancellor made affirmative findings — which we cannot determine to be clearly erroneous — that "the parties pooled their resources, both financially and physically, concerning the house — typical of the normal pattern of behavior for husband and wife." This finding by the chancellor of joint contribution was made in the face of testimony by Paul that the property was purchased with his funds alone and that all mortgage payments and improvements were through his sole efforts.

As previously indicated, Naomi was employed at the Westinghouse Electronics Corporation, both prior to the marriage when the parties were living together and during the marriage. There was a short period of unemployment in 1964 but thereafter she obtained part-time work at Korvette's Department Store. She remained there until 1967 when she regained her full-time employment at Westinghouse and retained it through 1975. In contradiction of his version of the facts, she testified that they shared all of their expenses by combining their earnings until she left appellant in 1972. Naomi testified at length with respect to

the improvements, stating that the costs were defrayed from joint funds and that they and the children shared the physical work.[7]

In the resolution of questions of fact, we are governed by Maryland Rule 1086 and may not substitute our judgment for that of the lower court unless it was clearly erroneous. Due consideration must be given the chancellor's opportunity to observe the demeanor of the witnesses, to judge their credibility and to pass upon the weight to be given their testimony. As in the case of the chancellor's determination with respect to the issue of fraud, we conclude not only that his findings were not "clearly erroneous" but that they are supported by substantial evidence. See DiTommasi v. DiTommasi, supra, 27 Md. App. at 246-47; Colburn v. Colburn, supra, 15 Md. App. at 513.

We observe also that the chancellor's determination would, in any event, find additional support — at least during the period from August 1966 until November 1972 when the parties were validly married and living together — from the Maryland "presumption of gift" where husband and wife own property jointly and one spouse pays the major portion of the taxes and encumbrances and costs of improvements. Klavans v. Klavans, 275 Md. 423, 427, 341 A. 2d 411 (1975). In the face of this presumption, the spouse seeking contribution must negate the presumed donative intent by clear and convincing evidence. Such evidence is here lacking.

Finally, we address the question of Paul's entitlement or not to contribution subsequent to the final separation of the parties in November 1972, after which Naomi concededly supplied no funds for the payment of taxes, mortgage amortization and interest. Naomi's reasons for leaving the home at that time have previously been quoted. The chancellor found that the "uncontradicted testimony indicates that plaintiff was forced to leave the marital abode

---

7. Although we consider doubtful whether the improvements included in appellant's claim for contribution, supra n.6, may be brought within the ambit of "necessary repairs and improvements," DiTommasi, supra, 27 Md. App. at 263, we need not decide that issue.

as the result of defendant's vicious conduct" and that her departure under such circumstances constituted an "ouster," relieving her of any obligation for contribution.

Ouster has been defined as a notorious and unequivocal act by which one cotenant deprives another of the right to the common and equal possession and enjoyment of the property. *Israel v. Israel,* 30 Md. 120, 125 (1869); *Van Bibber v. Frazier,* 17 Md. 436, 451 (1861). *See* 2 *American Law of Property* § 6.17 (A.J. Casner, ed. 1952). Where the chancellor had before him uncontradicted evidence that the appellee was forced to leave her home because of the appellant's violent conduct toward her, we cannot say that the conclusion that she was ousted was clearly erroneous. Maryland Rule 1086. Contrary to the suggestion contained in appellant's brief, ouster was not impermissibly presumed from appellant's exclusive possession. *See Hogan v. McMahon,* 115 Md. 195, 200, 80 A. 695 (1911).

Since the appellant ousted the appellee from the jointly owned property, thereby denying her the right to its use and enjoyment, we agree with the trial judge that the appellant is not entitled to contribution. *See Colburn v. Colburn, supra,* 265 Md. at 475-76; *Hogan v. McMahon, supra.*

Paul's lament that Naomi waited four years before acting comes with poor grace, to say the least. During that entire period, until now, he has had the benefit of possession of the premises and no claim is made, on her behalf, that he account to her for the value of such exclusive use. In this connection, we observe that Naomi has taken no cross appeal and therefore does not challenge the chancellor's ruling that her liability for contributions commenced as of February 9, 1976, the date of the decree of divorce *a vinculo matrimonii.*[8]

> *Decree affirmed; appellant to pay*
> *the costs.*

---

8. The chancellor concluded (erroneously, we think) that the parties became tenants in common as of the date of the decree. Since they were joint tenants beginning in 1964, as we have found, their 1976 divorce would have no effect on the joint tenancy. Of course, if they had been tenants by the entireties, the divorce would have converted that tenancy into a tenancy in common.